1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                         FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   THE TRAVELERS INDEMNITY              No.  1:18-cv-00720-DAD-JLT
     COMPANY OF CONNECTICUT, a
12   Connecticut Corporation, AND THE
     TRAVELERS PROPERTY CASUALTY
13   COMPANY OF AMERICA, a Connecticut     ORDER GRANTING PLAINTIFFS' MOTION
     Corporation,                          FOR SUMMARY JUDGMENT IN PART
14                                         AND GRANTING DEFENDANT'S CROSS-
                      Plaintiffs,          MOTION FOR SUMMARY JUDGMENT IN
15                                         PART
          v.
16                                         (Doc. Nos. 16, 17, 18)
     HUDSON INSURANCE COMPANY, a
17   Delaware Corporation

18                    Defendant.

19

20         This matter is before the court on the parties' cross-motions for summary judgment.

21   (Doc. Nos. 16, 17, 18.)  A hearing on the motions was held on June 18, 2019.  Attorney Aaron

22   Agness appeared in person on behalf of plaintiffs, and attorney Stephen Scott appeared in person

23   on behalf of defendant.  Having considered the parties' briefs and oral arguments, and for the

24   reasons set forth below, the court will grant both motions in part.

25                                     **BACKGROUND**

26         Plaintiffs The Travelers Indemnity Company of Connecticut ("Travelers Indemnity") and

27   The Travelers Property Casualty Company of America ("Travelers Property") (collectively,

28   "Travelers") and defendant Hudson Insurance Company ("Hudson") each and separately insured

                                              1

NV5 Holdings, Inc. and Nolte Associates, Inc. (collectively, "Nolte"). (Doc. No. 18-2) (Joint Statement of Undisputed Facts ("JSUF")) at 2, 4.) Travelers issued Nolte commercial general liability policies, and Hudson issued Nolte a professional services policy. (*Id.* at 2–4.) While insured under those policies, Nolte, a firm that provides construction management services, was named as a defendant in an underlying state court action stemming from a construction site accident. (*Id.*, Ex. 5.)

The present action is an insurance coverage dispute arising from a settlement paid by Travelers on behalf of Nolte in that underlying state court action. Travelers contends that Hudson must reimburse it for the entire settlement amount and half of the defense fees and costs it incurred in defending Nolte in that action, because the allegations against Nolte in that underlying action arose out of Nolte's professional services. (Doc. No. 18 at 2.) Hudson counters that Travelers' complaint fails as a matter of law because: (1) Travelers has pled the wrong causes of action; and (2) the events that gave rise to the underlying action against Nolte are not within the scope of the policy that Hudson issued to Nolte. (Doc. No. 17 at 7.) The following facts are relevant to the pending motions.[1]

**A.    The Underlying Lawsuit and Background Facts**

1.    Nolte's Construction Management Agreement with the City of Bakersfield

On May 20, 2009, Nolte and the City of Bakersfield (the "City") entered into a construction management agreement (the "CMA"). (JSUF at 4–5 & Ex. 4.) Pursuant to the CMA, Nolte was to "furnish a licensed Civil Engineer as Construction Manager" and to "competently and thoroughly provide Construction Management Services" for the second phase of the City's planned construction of a six-lane freeway (the "Project"). (*Id.* at 302, 313; Doc. No. 17 at 7.) These services included "construction observation, materials testing, and contract administration" for the Project, as well as "structural observation services, roadway observation

---

[1]  The parties have submitted a joint statement of undisputed facts (*see* JSUF), as well as separate statements of undisputed facts (*see* Doc. Nos. 17-2, 18-1.) The court will rely on the facts from one party's separate statement of undisputed facts to the extent that the other party has stipulated in response that the fact is "undisputed." When citing to a fact from one of the two separate statements of undisputed facts, the court will cite to the docket entry wherein the other party stipulates that the fact is undisputed. (*See* Doc. Nos. 20-1, 21-4.)

services, survey quality assurance, [and] materials testing and support staff, as needed, during the course of the construction." (JSUF at 313.) As relevant here, the CMA provided that:

> The Construction Management staff will conduct onsite observations of the work in progress to determine that it is, in general, proceeding in accordance with the Contract Documents.

> The Construction Management staff shall advise the Contractor whenever they believe that any work is unsatisfactory, faulty or defective or does not conform to the Contract Documents, or has been damaged, or does not meet the requirements of any field observation, test or approval required to be made; and advise the Contractor of work that should be corrected or rejected or should be uncovered for observation, or requires special testing, or approval . . .. Nolte personnel or subconsultants shall provide construction observation, material testing and quality control for the project. Construction observation, material testing and quality control shall conform to the State of California Construction Manual and Material Testing Manual.

(*Id.* at 317–318.) The CMA further provided that:

> Through more extensive onsite observations of the work in progress and field checks by the construction management staff, Nolte shall endeavor to provide further protection for the City against defects and deficiencies in the work of the Contractor; but, the furnishing of such services will not make Nolte responsible for or give Nolte control over construction means, methods, techniques, sequences, or procedures, or for safety precautions or programs, or responsibility for Contractor's failure to perform the Work in accordance with the Contract Documents.

(*Id.* at 314–15.) Finally, the CMA noted that Nolte's "tasks shall include all the procedures necessary to properly perform the Construction Management tasks, whether specifically included in the scope of work or not." (*Id.* at 302.)

 2. The Underlying Lawsuit, the Tenders, and the Defense of Nolte

 Justin Todahl ("Todahl") was employed as a laborer by one of the contractors working on the Project. (*Id.* at 5.) On August 28, 2012, Todahl was injured while working on the Project. (*Id.*) The parties agree that on the date Todahl sustained his injuries, Nolte representatives were at the construction site "for the purpose of providing professional services pursuant to the Construction Management Agreement." (*Id.* at 6.)

 On August 22, 2014, Todahl filed a first amended complaint against Nolte and other defendants in the Kern County Superior Court (the "Todahl action" or the "underlying action").

3

(*Id.* at 5.)  Therein, Todahl alleged that, on the date of the incident, "a cement truck suddenly and without warning backed into him, crushing his body between the cement truck and paving trough." (*Id.*)  Todahl asserted a general negligence cause of action against Nolte, alleging that it was "negligent in the selection, hiring, training, education, supervision, management, and retention of [contractors] . . . so as to have actually, legally, and proximately caused [Todahl] to suffer serious injuries." (*Id.* at 336.)  Todahl alleged that Nolte "had a responsibility to supervise the job and ensure that the job was being performed in a safe manner and in compliance with state and federal regulations[] because [Nolte] . . . w[as] responsible for providing construction management and/or general contractor services for the [Project]." (*Id.* at 337.)

In September 2014, Nolte tendered the Todahl action to Travelers under Travelers' Comprehensive General Liability Policy and to Hudson under Hudson's Professional Liability Policy. (Doc. Nos. 20-1 at 17; 21-4 at 6.)  Travelers agreed to defend Nolte under a reservation of rights, citing the professional services exclusion in its policy as the basis for its reservation. (Doc. No. 21-4 at 6.)  In or around October 2014, Travelers retained defense counsel to defend Nolte in the Todahl action, and it tendered Nolte's defense to Hudson. (*Id.*)  It appears that sometime thereafter Hudson "closed its file at the request of [Nolte]." (JSUF at 365.)

In February 2017, Todahl was deposed.  During his deposition, he testified that a Nolte employee or representative instructed him to clean out the paving trough between truckloads of cement. (Doc. No. 21-4 at 5.)  Specifically, Todahl testified that:

> [The Nolte employee] said [the troughs] need to be cleaned out after every truck, if not every two, because that way—and I think he said the same or you did, was so that it could meet the spec—the spec on—the poured concrete because if it wasn't cleaned out after every one or two trucks, that it would mix with the old concrete with the new concrete and then it would have to be removed.

(*Id.* at 6–7.)

On September 5, 2017, Travelers retendered its defense of Nolte to Hudson. (JSUF at 6.)  On November 2, 2017, Hudson responded to Travelers and acknowledged that the Todahl action was potentially covered under the policy it had issued to Nolte. (*Id.*; *see also id.*, Ex. 7.)  Specifically, Hudson stated that "we have determined that there may be a potential of coverage;

4

however, any such coverage would be excess to Travelers' policy, so Hudson will participate in the defense and indemnity of [Nolte] subject to a full reservation of rights following the exhaustion of Travelers' policy." (JSUF at 347.) On December 13, 2017, Travelers responded to Hudson, contending that "Hudson's excess coverage position was erroneous" and that "Traveler's coverage is co-primary with Hudson's." (*Id.* at 353.) Travelers demanded that "Hudson participate in resolution of th[e] claim on a pro-rata basis" given that "th[e] case clearly implicates Hudson's professional coverage." (*Id.*) On February 27, 2018, Hudson informed Travelers that it would participate in a mediation of Todahl's claim against Nolte scheduled for March 13, 2018. (*Id.* at 358.) Hudson also asserted that it had no duty to provide coverage because the allegations against Nolte did not arise out of Nolte's professional services and because its policy's "actual construction" exclusion precluded coverage. (*Id.* at 358–59.) Hudson reiterated its position that its coverage was only in excess to Travelers' primary coverage. (*Id.* at 359.) On March 2, 2018, Travelers responded to Hudson, contending that both policies were primary policies and that, depending on whether the underlying claim is a general liability claim or a professional services claim, either Travelers or Hudson would be responsible for indemnifying Nolte. (*Id.* at 361.) Travelers reiterated that both insurance carriers "should be participating in the defense on a 50/50 basis unless and until there is a judicial determination as to coverage" because "both carriers have acknowledged [sic] a potential for coverage." (*Id.*) On March 9, 2018, Hudson responded to Travelers, maintaining its position that it has no duty to contribute toward any settlement because the underlying claim is not covered by its policy." (*Id.* at 365.) Nevertheless, "in order to support [Nolte] and to avoid future coverage litigation," Hudson offered to "contribute 1/3rd of any settlement offer Travelers[] and Hudson agree to make . . . in return for Travelers' release of all claims for contribution from Hudson in this case." (*Id.*) Hudson also offered to pay one half of all defense fees incurred after September 5, 2017, which is the date when Travelers retendered the Todahl action to Hudson, because "Travelers ha[d] been involved and ha[d] controlled the defense of th[e] case since 2014" and Hudson had

/////

/////

closed its file at Nolte's request. (*Id.*) Hudson also confirmed that it would attend the March 13, 2018 mediation.[2] (*Id.*)

On or about April 5, 2018, Travelers settled the Todahl action on behalf of Nolte for $1,300,000.00, with Travelers Indemnity paying the per occurrence limit of $1,000,000.00 under its policy and Travelers Property paying $300,000.00 under its excess policy. (JSUF at 7; *see also* Doc. No. 21-4 at 8.) Hudson did not contribute toward Nolte's settlement of the Todahl action. (JSUF at 7.) Travelers also incurred defense fees and costs totaling $137,093.06 in defending Nolte in the Todahl action. (*Id.*)

**B.     The Insurance Policies**

1.     The Travelers Insurance Policies

Plaintiff Travelers Indemnity issued a commercial general liability ("CGL") insurance policy (insurance policy number 680-6B97547A-TCT-12) to Nolte, with effective dates of May 1, 2012 to May 1, 2013 and a per occurrence limit of $1,000,000.00 (the "Travelers policy"). (*Id.* at 2; Doc. No. 21-4 at 9.) Travelers Indemnity agreed to "pay those sums that [Nolte] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which th[e] insurance applies." (JSUF at 94.) However, the Travelers policy "does not apply to: . . . 'Bodily injury' or 'property damage' arising out of the rendering or failure to render any 'professional services.'" (*Id.* at 95, 136.) Under the Travelers policy

> "Professional services" means any services requiring specialized skill or training, including: . . . [s]upervision, inspection, quality control, architectural, engineering or surveying activity or service, job site safety, construction contracting, construction administration, construction management . . . or monitoring, testing, or sampling service necessary to perform any of the services described . . . above.

(*Id.* at 136.)

Plaintiff Travelers Property issued a commercial excess liability (or "umbrella") insurance policy (insurance policy number CUP-6B994065-12-47) to Nolte, with effective dates of May 1, 2012 to May 1, 2013 (the "Travelers excess policy"). (*Id.* at 3.) Pursuant to this policy, Travelers

---

[2] At the June 18, 2019 hearing on the pending motion, counsel for Hudson, attorney Scott confirmed that he was present at the March 13, 2018 mediation on behalf of Hudson.

Property agreed to "pay on behalf of [Nolte] the 'ultimate net loss' in excess of the 'applicable underlying limit' which [Nolte] becomes legally obligated to pay as damages because of 'bodily injury,' 'property injury,' [or] 'personal injury' . . . to which this insurance applies." (*Id.* at 229.) Like the Travelers policy, the Travelers excess policy excludes claims for "'[b]odily injury,' 'property damage,' [or] 'personal injury' . . . arising out of the rendering or failure to render any 'professional services.'" (*Id.* at 230, 265.) The Travelers excess policy contains a definition of "professional services" that is identical to the one found in the Travelers policy. (*See id.* at 265.)

### 2.   The Hudson Insurance Policy

Defendant Hudson issued an "Architects, Engineers & Environmental Services Professional Liability" insurance policy (insurance policy number AEE72460-04) to Nolte, with the effective dates of May 1, 2014 to May 1, 2015[3] and a $5,000,000 limit per claim and a $10,000,000.00 limit per policy year (the "Hudson policy"). (*Id.* at 4, 276.)

Pursuant to that policy, Hudson agreed to "pay on [Nolte's] behalf all sums in excess of the Deductible and up to the Limits of Liability . . . that [Nolte] become[s] legally obligated to pay as Damages and Claim Expenses resulting from Claims first made against [Nolte] during the Policy Year, as a result of a Wrongful Act." (*Id.* at 285) (emphasis omitted). The policy

> cover[ed] Damages and Claim Expenses that [Nolte] become[s]
> obligated to pay as a result of Claims arising out of . . . [Nolte's]
> participation in a legal entity, including a joint venture, but only for
> your liability arising out of Professional Services performed by the
> legal entity or joint venture.

(*Id.*) (emphasis omitted). The Hudson policy defines "professional services" as "those services that [Nolte] perform[s] for others, in [its] practice as an architect, engineer, land surveyor, interior designer, landscape architect, construction manager, scientist, technical consultant or as otherwise defined by endorsement to this Policy." (*Id.* at 288.) The Hudson policy excludes liability for

---

[3] The events giving rise to the underlying action took place in 2012 and appear, at first glance, to not be covered by the effective policy period under the Hudson policy, which is from May 1, 2014 to May 1, 2015. (*See* JSUF at 4.) However, at the June 18, 2019 hearing on the pending motions, counsel for Hudson explained that the Hudson policy is triggered by the date a claim is made, not the date of the incident giving rise to the claim. Here, it is undisputed that Hudson became aware of Todahl's claims within the Hudson policy's effective dates. (*See id.* at 5–6.)

7

"Damages and/or Claims Expenses . . . for, based upon, or arising from actual construction performed by [Nolte], [its] agent, or [its] subcontractor, including, but not limited to, performing construction, erection, fabrication, installation, assembly, manufacture, demolition, dismantling, drilling, excavation, dredging, remediation, or supplying any materials, parts or equipment." (*Id.* at 289.)

**C.     This Action**

On May 25, 2018, Travelers commenced this action against Hudson, alleging that Hudson was obligated to defend and indemnify Nolte in the Todahl action because Nolte's liability arose out of professional services that it rendered on the Project. (Doc. No. 1 at 10.) Travelers alleged that it was therefore entitled to reimbursement and indemnification for the entire settlement amount it paid on Nolte's behalf as well as half of the defense fees and costs it incurred in defending Nolte. (*Id.* at 11.) Travelers' complaint asserts causes of action for equitable indemnity, partial equitable indemnity, and equitable contribution. (*Id.* at 10–13.)

On March 15, 2019, Travelers and Hudson filed cross-motions for summary judgment. (Doc. Nos. 16, 17, 18.) On April 16, 2019, the parties filed their respective oppositions to the other's summary judgment motion. (Doc. Nos. 20, 21.) On April 30, 2019, Travelers filed its reply to Hudson's opposition, and on May 1, 2019, Hudson filed its reply to Travelers's opposition. (Doc. Nos. 23, 25.)

**LEGAL STANDARD**

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or

other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Wool v. Tandem Computs., Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Contra Costa Cty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987). Undisputed facts are taken as true for purposes of a

motion for summary judgment. *Anthoine v. N. Cent. Counties Consortium*, 605 F.3d 740, 745 (9th Cir. 2010). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . .. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

**ANALYSIS**

Travelers contends that, as a matter of law, Hudson must reimburse it for the entire amount it paid to settle the underlying suit against Nolte and half of the defense fees and costs it incurred in defending Nolte because: (1) the Hudson policy broadly covers claims "arising out of Professional Services," (2) the Travelers policy and the Travelers excess policy expressly exclude coverage for liability arising out of professional services, and (3) the "crux" of Todahl's allegations against Nolte in the underlying action arose out of Nolte's professional services. (Doc. No. 18 at 2.) Hudson counters that the complaint fails as a matter of law because: (1) Travelers has pled the wrong causes of action; and (2) the events that gave rise to the underlying action are not within the scope of the its insurance policy.[4] (Doc. No. 17 at 7.)

**A.     Whether Travelers Has Pled the Wrong Causes of Action**

Hudson first contends that the causes of action Travelers asserts here—for equitable indemnity, partial equitable indemnity, and equitable contribution—are not legally viable claims because the Hudson and Travelers policies do not insure against the same risk. (*Id.* at 16; Doc. No. 21 at 16.) Hudson argues that the only viable claim available to Travelers was for equitable

---

[4] In its cross-motion for summary judgment, Hudson also initially argued that its duty to defend Nolte pursuant to the Hudson policy was never triggered because the $100,000.00 deductible on the policy had not been exhausted. (Doc. No. 21 at 21.) In this regard, Hudson argued that "Travelers [was] the primary insurer and the Hudson Policy would only come into play as secondary[,] assuming actual coverage was found." (*Id.*) In other words, Hudson argued that its policy was "a secondary or excess policy, [and] Hudson did not have a duty to defend until the deductible was exhausted." (*Id.*) At the June 18, 2019 hearing on the pending motion, counsel for Hudson, attorney Scott, explained that this was Hudson's "initial" position, but that Hudson had since "withdrawn that [argument]." (*See also id.* at n.45) (Noting that "Hudson is no longer asserting . . . that it's policy is excess to Travelers' policy"). Attorney Scott noted that Hudson is "not claiming one [policy] is excess to the other." Accordingly, the court will not address Hudson's withdrawn contention that its policy is excess to the Travelers policy.

10

subrogation, which it has not asserted. (Doc. No. 17 at 16–17.) Thus, Hudson argues that Travelers' complaint fails as a matter of law.

The court concludes that this argument fails because it is based upon a misinterpretation of the relevant law.

> The case law discussing the three principles of contribution, indemnification and subrogation in the insurance context is surprisingly muddled; courts have often confused the principles, thereby providing a fertile supply of quotations for parties seeking to utilize any one of the three concepts as the need arises. As one California appellate court noted, "[i]t is hard to imagine another set of legal terms with more soporific effect than indemnity, subrogation, [and] contribution . . . ."

*Fireman's Fund Ins. Co. v. Commerce & Indus. Ins. Co.*, No. C-98-1060VRW, 2000 WL 1721080, at *2 (N.D. Cal. Nov. 7, 2000) (quoting *Herrick Corp v. Canadian Insurance Co*, 29 Cal. App. 4th 753, 756 (1994)). Nevertheless, distinguishing between these three equitable theories of recovery is of import because, depending on the facts involved in a particular action, a claim brought under the wrong theory may fail as a matter of law. For example, "the right to contribution arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without any participation by the others." *Fireman's Fund Ins. Co. v. Maryland Cas. Co.*, 65 Cal. App. 4th 1279, 1293 (1998). But, as that definition implies, "the right to equitable contribution arises only when all of the insurance carriers share the same level of obligation on the same risk as to the same insured." *Commerce & Indus. Ins. Co.*, 2000 WL 1721080, at *3 (citation and internal quotation marks omitted); *Cont'l Cas. Co. v. Nationwide Mut. Ins. Co.*, No. CV 14-07326-GW (PLAx), 2014 WL 12607694, at *4 (C.D. Cal. Nov. 3, 2014) ("Put another way, if there exists no common obligation and no payment on the same risk, . . . there exists no claim for equitable contribution."). On the other hand, "[e]quitable subrogation enables one insurer who has paid a debt for which another insurer is primarily liable to sue from the perspective of the insured under the policy on the argument that the second insurer has failed to pay." *Id.* at *3. Thus, "[t]he right of subrogation is purely derivative" as "[t]he subrogated insurer is said to 'stand in the shoes' of its insured." *Maryland Cas. Co.*, 65 Cal. App. 4th at 1293. "Equitable indemnification is similar

11

to equitable subrogation in that it also enables an insurer that has paid an obligation which was entirely the responsibility of a co-insurer to place the complete burden for the loss on that other party," but "[t]he party seeking reimbursement through indemnification . . . does so in his own right (as with a contribution claim)." *Commerce & Indus. Ins. Co.*, 2000 WL 1721080, at *3; *St. Paul Fire & Marine Ins. Co. v. Ins. Co. of the State of Pennsylvania*, No. 15-cv-02744-LHK, 2016 WL 1191808, at *7 (N.D. Cal. Mar. 28, 2016) ("[E]quitable indemnity is a restitution-based claim resulting from unjust enrichment.").

Here, the undisputed evidence before the court on summary judgment establishes that Travelers and Hudson did not insure Nolte against the same risk. (*See, e.g.*, Doc. No. 1 at 8–9) ("[T]he carriers do not insure the same risk. The Travelers Policy is a general liability policy whereas the Hudson Policy is a professional liability policy."). Travelers therefore cannot assert a cause of action for equitable contribution. *See Maryland Cas. Co.*, 65 Cal. App. 4th 1282. Because there is no genuine dispute as to this issue, the court will grant Hudson's cross-motion for summary judgment to the extent it contends that Travelers cannot assert such a claim.

For the reasons that follow, however, the court finds that Hudson is incorrect, as a matter of law, in arguing that Travelers cannot assert a cause of action for equitable indemnification and, instead, could only have asserted a cause of action for equitable subrogation. In advancing this argument Hudson relies heavily on the decision in *Maryland Casualty* to assert that, "[s]imilar to contribution claims, indemnity claims are also not available between carriers who insure different risks. This is because California courts refer to equitable contribution and equitable indemnity interchangeably." (Doc. No. 21 at 17) (citing *Maryland Casualty*, 64 Cal. App. 4th at 1295) (emphasis omitted). Hudson's reliance on *Maryland Casualty* is unavailing, however, because the state appellate court there did *not* refer to equitable contribution and equitable indemnity "interchangeably." Indeed, that court never once mentioned—let alone analyzed—equitable indemnification, and instead merely discussed the differences between equitable *contribution* and equitable *subrogation*. *See generally Maryland Cas. Co.*, 65 Cal. App. 4th 1279. More importantly, Hudson is simply incorrect as a matter of law. As discussed above, courts in California recognize that a claim for equitable indemnification is different than a claim for

equitable contribution.  *See also St. Paul Fire & Marine Ins. Co. v. Ins. Co. of the State of Pennsylvania*, No. 15-cv-02744-LHK, 2016 WL 1191808, at *7 (N.D. Cal. Mar. 28, 2016) ("[E]quitable contribution and equitable indemnity are not equivalent because whereas contribution requires two parties to equally share a burden, equitable indemnity requires only that one insurer pay a liability that another insurer should have discharged.").

Here, Travelers' contention is that Hudson should have provided coverage to Nolte in the underlying action because Todahl's allegations against Nolte fell within the scope of the Hudson policy's insuring clause, and not the Travelers policy's insuring clause.  Indeed, counsel for Hudson agreed at the hearing on the pending motions that "there are two policies [at issue here] that insure different risks; one of them applies and one of them doesn't."  Plainly then, Travelers may assert a claim for equitable indemnification.  *See, e.g., Commerce & Indus. Ins. Co.*, 2000 WL 1721080, at *3 ("Equitable indemnification . . . enables an insurer that has paid an obligation which was entirely the responsibility of a co-insurer to place the complete burden for the loss on that other party.").  Accordingly, the undersigned concludes that Travelers may proceed on its equitable indemnification claim against Hudson.  Because there is no genuine dispute as to whether Travelers can assert a cause of action for equitable indemnification, the court will deny Hudson's summary judgment motion to the extent that it seeks to establish that Travelers, as a matter of law, cannot assert such a claim.

**B.**      **Whether Hudson Had a Duty to Defend and/or Indemnify Nolte in the Underlying Action**

Having determined that Travelers may proceed on its equitable indemnification claim against Hudson, the court will now address the substance of Travelers motion for summary judgment.  That is, the court will evaluate whether, as a matter of law, Hudson is obligated to reimburse Travelers for any portion of the defense fees and costs that Travelers incurred in Nolte's defense or the amount that Travelers paid to settle the underlying action on behalf of Nolte.

/////

/////

1.     <u>Hudson Is Obligated to Reimburse Travelers for Half of the Defense Fees and</u>
<u>Costs that Travelers Incurred in Defending Nolte</u>

"It is . . . a familiar principle that a liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity." *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal. 4th 1076, 1081 (1993), *as modified on denial of reh'g* (May 13, 1993). "[T]he [insurer] must defend a suit which *potentially* seeks damages within the coverage of the policy." *Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 275 (1966). "The determination [of] whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy." *Horace Mann*, 4 Cal. 4th at 1081. In analyzing the policy, "courts must consider both the [] language in the policy, and the endorsements or exclusions affecting coverage, if any, included in the policy terms." *Modern Dev. Co. v. Navigators Ins. Co.*, 111 Cal. App. 4th 932, 939 (2003), *as modified* (Aug. 29, 2003), *as further modified* (Sept. 18, 2003). "Facts known to the insurer and extrinsic to the third party complaint can generate a duty to defend, even though the face of the complaint does not reflect a potential for liability under the policy." *Montrose Chem. Corp. v. Superior Court*, 6 Cal. 4th 287, 296 (1993).

"The insurer's defense duty is obviated where the facts are undisputed and conclusively eliminate the potential the policy provides coverage for the third party's claim." *Reg'l Steel Corp. v. Liberty Surplus Ins. Corp.*, 226 Cal. App. 4th 1377, 1389 (2014). To prevail in an action for declaratory relief with respect to the duty to defend, "the insured must prove the existence of a *potential for coverage*, while the insurer must establish *the absence of any such potential*." *Id.* at 300. "Facts merely tending to show that the claim is not covered or may not be covered, but are insufficient to eliminate the possibility that resultant damages (or the nature of the action) will fall within the scope of coverage . . . add no weight to the scales." *Montrose Chem.*, 6 Cal. 4th at 300.

Accordingly, for Hudson to establish that it had no duty to defend Nolte in the underlying action, it must show that the underlying claims do not fall within the Hudson policy's coverage. This it cannot do. Hudson acknowledged that the Todahl action was potentially covered under the Hudson policy while that action was still pending. (*See* JSUF at 347) (noting by way of letter

14

dated November 2, 2017 that "[Hudson] ha[s] determined that there may be a potential of coverage"). Because an insurer "must defend a suit which *potentially* seeks damages within the coverage of [its] policy" *Gray*, 65 Cal. 2d at 275, the undersigned concludes that Hudson was obligated to partake in Nolte's defense in the Todahl action.

After acknowledging a potential for coverage, Hudson offered to pay only one half of all defense fees incurred *after* September 5, 2017—the date when Travelers retendered the Todahl action to Hudson—arguing that "Travelers ha[d] been involved and ha[d] controlled the defense of th[e] case since 2014" and that Hudson had closed its file at Nolte's request. (JSUF at 365.) To the extent that Hudson is arguing that it should only be required to pay for half of the defense fees incurred after Travelers' retender, its position is not persuasive. It is undisputed on summary judgment that both Nolte and Travelers first tendered the Todahl action to Hudson in or around October of 2014. (Doc. No. 21-4 at 6.) It is further undisputed that Travelers obtained counsel to defend Nolte in the Todahl action in or around the same time as it first tendered the defense of that action to Hudson. (*Id.*) Moreover, it was clear from the outset of the underlying action in state court that Todahl's claims against Nolte were *potentially* covered under Hudson's *professional services* insurance policy because Todahl alleged in that action that Nolte "had a responsibility to supervise the job and ensure that the job was being performed in a safe manner and in compliance with state and federal regulations[] because [Nolte] . . . w[as] responsible for providing *construction management and/or general contractor services* for the [Project]." (*Id.* at 337) (emphasis added); *see also Storek v. Fid. & Guar. Ins. Underwriters, Inc.*, 504 F. Supp. 2d 803, 812 (N.D. Cal. 2007) ("Under California law, an insurer's duty to defend is determined by those facts known by the insurer at the inception of a third party lawsuit, . . . or from the facts and inferences known to an insurer from the pleadings, available information and its own investigations at the time of the tender of defense.") (emphasis and citations omitted), *aff'd,* 320 F. App'x 508 (9th Cir. 2009). Because "[t]he defense duty is a continuing one, arising on tender of defense and lasting until the underlying lawsuit is concluded . . . or until it has been shown there is *no* potential for coverage," *Montrose Chem.*, 6 Cal. 4th at 295, Hudson was obligated to defend Nolte in the underlying action or seek a judicial declaration that there was no potential that

the Todahl action was covered under its policy. *See Truck Ins. Exch. v. Superior Court*, 51 Cal. App. 4th 985, 994 (1996) ("While the underlying action is pending, the carrier can file an action for declaratory relief and attempt to obtain a declaration that no duty to defend or indemnify exists. Such a determination would allow it to withdraw from the defense without subjecting the carrier to a claim of breach of contract or bad faith."). Hudson, however, did not seek such a judicial declaration that it had no duty to defend Nolte prior to deciding not to defend or indemnify Nolte. While Hudson evaluated—both through Nolte's insurance agent as well as through its own corporate counsel and risk manager (Doc. No. 17 at 11)—whether a potential for coverage existed, the law does not allow Hudson to disclaim its obligation to defend its insured absent a judicial determination to that effect.[5]

For these reasons and based upon the undisputed evidence before the court on summary judgment, the undersigned concludes that Hudson had a duty to defend Nolte in the Todahl action. Because there is no genuine dispute as to this fact, the court will grant Travelers' summary judgment motion to the extent that it seeks to establish that Travelers, as a matter of law, is entitled to half of the defense fees and costs that it incurred in defending Nolte.

/////

/////

/////

---

[5] Although Hudson withdrew its argument that its policy was excess to Travelers' primary policy, *see* fn.4 above, it continues to argue that its duties to defend and indemnify were subject to its policy's $100,000.00 deductible. (Doc. No. 21 at 21 n.45.) This argument is also without merit. First, although Hudson apparently wishes to apply this argument both to its duties to defend and to indemnify, it only analyzes it in the context of its duty to defend. Second, even with respect to its duty to defend, Hudson provides the court with no authority supporting its position. Hudson's citation to cases analyzing the effect of a self-insured retention on an insurer's obligation to defend is of no import because, even if deductibles and self-insured retentions are analyzed in the same manner (and it is not clear to the court that they are), "in the absence of clear policy language so providing, to require the exhaustion of a self-insured retention before an insurer will have a duty to defend would be contrary to the reasonable expectations of the insured to be provided an immediate defense in connection with its primary coverage." *Legacy Vulcan Corp. v. Superior Court*, 185 Cal. App. 4th 677, 696 (2010). Hudson does not contend that its policy expressly provides that the $100,000.00 deductible had to be exhausted before its obligation to defend Nolte would be triggered, and the court's review of the policy has identified no such language.

Accordingly, Hudson is to reimburse Travelers for half of the $137,093.06 it expended in defending Nolte, or $68,546.53.

      2.    <u>Hudson is Not Obligated to Equitably Indemnify Travelers for the Settlement Amount that Travelers Paid on Behalf of Nolte</u>

The court next evaluates whether Hudson had a duty to indemnify Nolte in the underlying action, such that Hudson is now obligated to equitably indemnify Travelers for the $1,300,000.00 that Travelers paid to settle Todahl's claims against Nolte in the underlying state court action.

"[An] insurer's duty to indemnify runs to claims that are actually covered, in light of the facts proved." *Buss v. Superior Court*, 16 Cal. 4th 35, 45 (1997). Thus, an insurer's duty to defend its insured is broader than its duty to indemnify its insured in that, as discussed above, the duty to defend is triggered if the underlying claims are *potentially* covered by its policy, but the duty to indemnify is triggered only if the underlying claims are *actually* covered by its policy. *Certain Underwriters at Lloyd's of London v. Superior Court*, 24 Cal. 4th 945, 958 (2001); *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal. 4th 1076, 1081 (1993), *as modified on denial of reh'g* (May 13, 1993).

Nonetheless, Travelers relies on the decision in *Safeco Insurance Company of America v. Superior Court*, 140 Cal. App. 4th 874 (2006), and argues that all it need do in order to establish Hudson's duty to indemnify is to demonstrate that the underlying claims are *potentially* covered under the Hudson policy and that the burden then shifts to Hudson to prove the absence of actual coverage. (Doc. No. 18 at 20.) Travelers' reliance on *Safeco* in support of this argument is misplaced. In that case, the California Court of Appeal held that

> *in an action for equitable contribution* by a settling insurer against a nonparticipating insurer, the settling insurer has met its burden of proof when it makes a prima facie showing of coverage under the nonparticipating insurer's policy—the same showing necessary to trigger the recalcitrant insurer's duty to defend—and that the burden of proof then shifts to the nonparticipating insurer to prove the absence of actual coverage.

*Safeco*, 140 Cal. App. 4th at 881 (emphasis added). As evidenced by this quoted language, the court in *Safeco* articulated this standard only with respect to claims for equitable contribution. As discussed above, however, here Travelers cannot assert a claim for equitable contribution because

the policies at issue in this action cover different risks.  Travelers has pointed the court to no authority, and the court is aware of none, for the proposition that the *Safeco* burden-shifting framework for equitable contribution claims applies to claims for equitable indemnity. Accordingly, the court will evaluate whether Travelers has established that the underlying claims were actually covered by the Hudson policy, in line with the case law discussed above.

In this regard, Travelers contends that Hudson's professional services policy covers the underlying action because Todahl's claims against Nolte arose from Nolte's professional services. (Doc. No. 18 at 2.)  Travelers also argues that its commercial general liability and excess policies do not cover the underlying action because they contain professional services exclusions.  (*Id.*) Hudson counters that the injuries Todahl suffered did not arise from the rendering of Nolte's professional services, and even if they did, its policy's "actual construction" exclusion precludes coverage.[6]  (Doc. No. 17 at 17–24.)

The parties agree that, on the date Todahl sustained his injuries, representatives of Nolte were at the construction site "for the purpose of providing professional services pursuant to the Construction Management Agreement."  (JSUF at 6.)  Travelers position is that Nolte's liability arose out of the rendering of its professional services because "Nolte's employee . . . instructed Todahl to clean out the paving troughs to ensure the consistency of the cement was compliant with specifications."  (Doc. No. 18 at 22–23.)  This, Travelers argues, constitutes a "professional service" as that term is defined in the Hudson policy and by the CMA because Nolte was hired to provide construction management services.  (*Id.* at 23.)  Travelers' position, however, does not answer the dispositive question here:  in instructing Todahl to clean out the paving troughs, did the Nolte employee provide a professional service pursuant to the CMA?  For the reasons explained below, the court concludes that the answer to that question is no.

As an initial matter, the court notes that Travelers has provided no support for its position that Nolte's liability arose out of the rendering of its professional services.  Travelers' argues that

---

[6] Hudson also contends that Nolte did not instruct Todahl to clean out the troughs after every truckload, but the parties have stipulated to this fact, and so the court will not address Hudson's argument in this regard.  (*See* Doc. No. 18-2 at 6.)

because (1) "courts have defined 'professional services' as those 'arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual,'" and (2) "[t]he instruction [at issue] arose out of a professional construction management vocation[] [that] was based on specialized knowledge of cement specifications . . . and [] involved a skill that was predominantly mental," the instruction therefore arose out of Nolte's professional services. (Doc. No. 18 at 21) (quoting *Tradewinds Escrow, Inc. v. Truck Ins. Exch.*, 97 Cal. App. 4th 704, 713 (2002)). Travelers' argument is not persuasive. It is not the case that any task Nolte employees completed while working on the Project was within the scope of Nolte's professional services. The decision in *Blumberg v. Guarantee Insurance Company*, 192 Cal. App. 3d 1286 (1987), is instructive in this regard. In that case, an attorney, insured under a professional liability policy for claims arising out of acts or omissions in rendering or failing to render professional services for others in his capacity as a lawyer, tendered his defense of his former law partner's breach of partnership lawsuit to his insurer. *Id.* at 1290–91. In finding that the professional services insurance policy at issue there did not provide coverage for the breach of partnership lawsuit, the court noted that, "at the time Blumberg made the alleged misrepresentations [to his law partner], he was not rendering professional services 'for others,' nor acting in his 'capacity as a lawyer.'" *Id.* at 1292–93. Rather, the court found "Blumberg was acting in his capacity as Zommick's law partner and the fact that he happened to be a lawyer was of no import what[so]ever." *Id.* at 1293. A similar rationale applies here because even though Nolte's engineers were onsite on the day of Todahl was injured, as discussed below, when Nolte's employee instructed Todahl to clean out the troughs, that employee was not acting within the scope of Nolte's professional services.

Pursuant to the CMA—the agreement defining the scope of Nolte's professional services with regard to the Project—Nolte was to "furnish a licensed Civil Engineer as Construction Manager" and to "competently and thoroughly provide Construction Management Services" for the Project. (JSUF at 302, 313; Doc. No. 17 at 7.) These services—as defined in Exhibit A to the CMA, "DRAFT SCOPE OF CONSULTANT SERVICES"—included "construction observation, materials testing, and contract administration" for the Project, as well as "structural observation

services, roadway observation services, survey quality assurance, [and] materials testing and support staff, as needed, during the course of the construction." (JSUF at 313.) To the extent that Nolte observed that construction was not taking place in accordance with the Project's plans or specifications, the CMA required Nolte to *advise contractors* on any work that was unsatisfactory, faulty or defective or did not conform to the Project's plans, or had been damaged, or did not meet the requirements of any field observation, test or approval required to be made, (JSUF at 317–318) (emphasis added); it did not require or authorize Nolte to *instruct laborers—* as its' employee did with Todahl—on *how* to correct any deficiency that Nolte observed. In other words, pursuant to the CMA, Nolte's responsibilities included observing the construction and advising a laborer's employer—the contractor, not the laborer himself—that its laborers were not in compliance with the Projects plans or specifications. Hudson therefore correctly notes that Nolte was hired to serve as the City's "eyes and ears," (Doc. No. 17 at 3); it was not hired to serve as the City's mouth. Travelers argues that this ignores the purpose behind why the instruction was given to Todahl which was "to ensure compliance with cement specifications and protect the project against any defects and deficiencies." (Doc. No. 20 at 18.) Travelers again misses the mark. The dispositive issue is not why the instruction was given to Todahl but whether giving the instruction was within the scope of the professional services Nolte was hired to render. The CMA establishes that it was not. Indeed, not only is instructing laborers on how to conduct construction not included within the scope of Nolte's professional services as defined by the CMA, the CMA also specifically states that, with respect to its services rendered during construction, Nolte

> [t]hrough more extensive onsite observations of the work in progress and field checks by the construction management staff, [] shall endeavor to provide further protection for the City against defects and deficiencies in the work of the Contractor; *but, the furnishing of such services will not make Nolte responsible for or give Nolte control over construction means, methods, techniques, sequences, or procedures, or for safety precautions or programs, or responsibility for Contractor's failure to perform the Work in accordance with the Contract Documents*.

(JSUF at 314–15) (emphasis added). Thus, the CMA expressly noted that Nolte is *not* responsible for construction means, methods, techniques, sequences or procedures—such as the

exact manner the cement troughs needed to be cleared—nor is Nolte responsible for safety precautions.

That Nolte's professional services did not include giving the instruction that Todahl alleged he received from a Nolte employee is further bolstered by three uncontroverted declarations from Nolte engineers that Hudson has attached to its cross-motion for summary judgment. Joey Carrol, a Nolte field engineer who was working on the Project on the day of the incident, avers in his declaration that: (1) his duty was to observe the Project to make sure it complied with the plans; (2) neither he, nor any other field engineer to his knowledge, exercised control over how the contractors' laborers did their jobs; and (3) that directing laborers on how to do their jobs "was not part of Nolte's professional services on the [] Project." (Doc. No. 17-8 at 1–2.) Tiffany Goodwin, a Nolte field engineer who was working on the Project as the lead field engineer on the day of the incident, avers that she is familiar with the job responsibilities of Nolte's field engineers, that Nolte was hired to observe, inspect, and report to the City whether work on a particular day complied with the Project's plans and specifications, and that Nolte's engineers had no control over the manner in which the laborers did their jobs. (Doc. No. 17-7 at 1–2.) Goodwin also declares that, prior to the incident, she observed a co-employee of Todahl's engaging in the same tasks as Todahl and that she "did not, and would not, direct [that laborer] or any other [laborer] . . . on how to do their job." (*Id.* at 2.) Todd George, a Nolte field engineer supervisor who was also working on the day of the incident, avers in his declaration that "[t]he job responsibilities of [Nolte] field engineers . . . was to be the [City's] . . . 'eyes and ears' and to only observe the construction . . . to report back to the City as to whether the project was built per the plans and specifications. . . . [Nolte] engineers were not authorized to direct, and would not direct the work of any . . . laborer." (Doc. No. 17-4 at 1–2.) George also states that instructing laborers was not part of Nolte's professional services on the Project and that any such instructions

/////

/////

/////

/////

would be outside the scope of Nolte's professional services rendered pursuant to the CMA. (*Id.* at 2.)[7]

Thus, the undisputed evidence before the court on summary judgment establishes that instructing laborers such as Todahl on how often to clean out cement troughs was not within the scope of Nolte's professional services. Because there is no genuine dispute as to this issue, the court will deny Travelers' summary judgment motion to the extent it seeks to establish that the Hudson professional services policy actually covered the underlying state court action.[8] Moreover, because the court concludes that Nolte's liability in the underlying action did not arise out of its rendering of professional services, the court also concludes that the professional services exclusions in the Travelers' policies do not preclude coverage.

## CONCLUSION

For the reasons set forth above,

1.   Hudson's cross-motion for summary judgment (Doc. Nos. 16, 17) is granted in part and denied in part as follows:

      a.   The court concludes that Travelers cannot assert a cause of action for equitable contribution as a matter of law;

      b.   The court concludes that Travelers is not entitled to equitable indemnification or partial equitable indemnification from Hudson for the

---

[7] Travelers levels various evidentiary objections to these declarations, including that: (1) each is irrelevant and immaterial because the declarations attempt to re-litigate the issue of Nolte's liability which was already resolved; and (2) the declarants lack personal knowledge as to the responsibilities of Nolte field engineers or whether the instruction alleged was given. (Doc. No. 20-3 at 2–7.) With respect to Travelers' first objection, the court is not considering those aspects of the declarations which state that the declarants did not see or hear a Nolte employee instruct Todahl to clean the troughs, or any other averments that call into question whether a Nolte employee gave Todahl that instruction. Rather, as discussed above, that fact is undisputed for the purposes of resolving the pending motions. With respect to Travelers' objection that the declarants lack personal knowledge as to the responsibilities of Nolte field engineers, the court overrules that objection. Each of the declarants is either a Nolte field engineer, lead field engineer, or field engineer supervisor, and each avers that the statements in their declarations are based on their personal knowledge. (*See* Doc. Nos. 17-4, 17-7, 17-8.)

[8] As a result, the court need not address Hudson's remaining argument that the Hudson's policy's "actual construction" exclusion precludes coverage. (Doc. No. 17 at 23–24.)

22

1             amount Travelers' paid to settle the underlying action because that action is

2             not actually covered by the Hudson policy;

3      c.       Hudson's cross-motion for summary judgment is denied in all other

4             respects;

5    2.      Travelers' cross-motion for summary judgment (Doc. No. 18) is granted in part

6        and denied in part as follows:

7      a.      Travelers is entitled to equitable indemnification from Hudson for half of

8             the $137,093.06 that Travelers expended in defending Nolte in the

9             underlying action, or $68,546.53, because that underlying action was

10            potentially covered by the Hudson policy at the time the settlement was

11            reached;

12      b.      Traveler's cross-motion for summary judgment is denied in all other

13             respects; and

14    3.      The Clerk of the Court is directed to close this case.

15

16 IT IS SO ORDERED.

17    Dated:   **March 5, 2020**              _Dale A. Drozd_

18                                         UNITED STATES DISTRICT JUDGE